**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

|  |  |
|---|---|
| SCOTT D. NORDSTROM,<br>　　　　　*Plaintiff-Appellant*,<br><br>　　　　　v.<br><br>CHARLES L. RYAN, Director of<br>ADOC; A. RAMOS, Deputy Warden;<br>F. HAWTHORNE,<br>　　　　　*Defendants-Appellees.* | No. 16-15277<br><br>D.C. No.<br>2:11-cv-02344-<br>DGC<br><br><br>OPINION |

Appeal from the United States District Court
for the District of Arizona
David G. Campbell, District Judge, Presiding

Argued and Submitted January 11, 2017
San Francisco, California

Filed May 18, 2017

Before: RICHARD R. CLIFTON and MILAN D. SMITH, JR., Circuit Judges, and RALPH R. ERICKSON,* District Judge.

Opinion by Judge Milan D. Smith, Jr.

---

* The Honorable Ralph R. Erickson, United States District Judge for the District of North Dakota, sitting by designation.

## SUMMARY[**]

### Prisoner Civil Rights

The panel reversed the district court's dismissal of an action brought pursuant to 42 U.S.C. § 1983 by an Arizona state prisoner alleging that the Arizona Department of Correction's policy and practice of inspecting inmates' outgoing legal mail violated the Sixth and First Amendment, and remanded.

The panel held that Arizona's current "inspection" policy did not satisfy the standard articulated in *Nordstrom v. Ryan*, 762 F.3d 903, 906 (9th Cir. 2014) because the policy called for page-by-page content review of inmates' confidential outgoing legal mail. Further, the policy did not satisfy the four-part test identified in *Turner v. Safley*, 482 U.S. 78, 89–91 (1987), because Arizona did not produce evidence of a threat to prison security sufficient to justify its policy, and because feasible, readily available alternatives were apparent.

### COUNSEL

Gregory C. Sisk (argued), Attorney; Bridget A. Duffus and Katherine J. Koehler, Certified Law Student Representatives; Appellate Clinic, University of St. Thomas School of Law, Minneapolis, Minnesota; for Plaintiff-Appellant.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Neil Singh (argued), Assistant Attorney General; Mark Brnovich, Arizona Attorney General; Office of the Attorney General, Phoenix, Arizona; for Defendants-Appellees.

Robin E. Wechkin, Vice Chair, 9th Circuit Amicus Committee, National Association of Criminal Defense Lawyers, Sidley Austin LLP, Seattle, Washington; Elliot Dolby Shields, Chair, Civil Rights & Liberties Committee, New York County Lawyers Association, New York, New York; for Amici Curiae New York County Lawyers Association and National Association of Criminal Defense Lawyers.

Bryan A. Stevenson and Benjamin H. Schaefer, Montgomery, Alabama, as and for Amicus Curiae Equal Justice Initiative.

Kelly A. Kszywienski, Snell & Wilmer LLP, Phoenix, Arizona; Lawrence Fox, Yale Law School, New Haven, Connecticut; for Amicus Curiae Ethics Bureau at Yale.

## OPINION

M. SMITH, Circuit Judge:

Scott Nordstrom, a death row inmate in Arizona state prison, appeals the district court's dismissal of his claims that the Arizona Department of Corrections (ADC) policy and practice for inspecting inmates' outgoing legal mail violates his Sixth and First Amendment rights. We hold that ADC's current "inspection" policy does not satisfy the standard articulated in *Nordstrom v. Ryan*, 762 F.3d 903, 906 (9th Cir. 2014) (*Nordstrom I*), because the policy calls for page-by-page content review of inmates' confidential

outgoing legal mail.  Further, the policy does not satisfy the four-part test identified in *Turner v. Safley*, 482 U.S. 78, 89–91 (1987), because ADC did not produce evidence of a threat to prison security sufficient to justify its policy, and because feasible, readily available alternatives are apparent. Accordingly, we REVERSE the district court's dismissal of Nordstrom's Sixth and First Amendment claims, and remand to the district court for further proceedings.

## FACTS AND PRIOR PROCEEDINGS

Nordstrom alleges that when he sought to mail a confidential letter addressed to his attorney the officer on duty actually read his letter, rather than merely scanned or inspected it.  After about 15 seconds, Nordstrom requested that the officer stop, and the officer responded "don't tell me how to do my job; I am authorized to search legal mail for contraband as well as scan the content of the material to ensure it is of legal subject matter."  Nordstrom persisted, and the officer ceased reading (or scanning) the letter.

Nordstrom filed formal grievances, which were denied on the ground that ADC "is authorized to scan and is not prohibited from reading [legal] mail to establish the absence of contraband and ensure the content of the mail is of legal subject matter."  This stated ground for denial conforms to ADC's legal mail policy, which provides that ADC staff must, in the presence of the inmate, inspect, but not read, outgoing legal mail for the presence of contraband.  The inspection must be "only to the extent necessary to determine if the mail contains contraband, or to verify that its contents qualify as legal mail and do not contain communications about illegal activities."  Contraband is defined broadly to include "[a]ny non-legal written correspondence or communication discovered as a result of scanning incoming or outgoing legal mail."

Nordstrom filed this 42 U.S.C. § 1983 suit against ADC, seeking a declaratory judgment and injunction against its legal mail policy and practice, alleging violations of his Sixth and First Amendment rights. *Nordstrom I*, 762 F.3d at 906. The district court dismissed the complaint for failure to state a claim. *Id.* On appeal, we held that Nordstrom stated a claim for violation of his Sixth Amendment rights, and that prison officials may *inspect* outgoing legal mail in an inmate's presence for contraband, among other things, but that prison officials may not *read* such mail. *Id*. at 906, 910–11. We remanded for consideration of Nordstrom's allegation that ADC has had a policy and practice of reading legal mail. *Id.* at 911–12.

On remand, the district court denied Nordstrom's request for a declaratory judgment and permanent injunction, holding that ADC's policies and practices did not violate the Sixth or First Amendments. *Nordstrom v. Ryan*, 128 F. Supp. 3d 1201, 1219 (D. Ariz. 2016) (*Nordstrom II*). Nordstrom appealed.

## STANDARDS OF REVIEW

We review the district court's Article III standing decision de novo. *Braunstein v. Arizona Dep't of Transp.*, 683 F.3d 1177, 1184 (9th Cir. 2012).

Regarding Nordstrom's Sixth Amendment claim, we review questions of law and "mixed questions of law and fact implicating constitutional rights" de novo. *Am.-Arab Anti-Discrimination Comm. v. Reno*, 70 F.3d 1045, 1066 (9th Cir. 1995). We review factual findings for clear error. *Crittenden v. Chappell*, 804 F.3d 998, 1006 (9th Cir. 2015).

We review the district court's holding that ADC's policy does not violate the First Amendment de novo, including any

underlying factual findings.  *Tucker v. State of Cal. Dep't of Educ.*, 97 F.3d 1204, 1209 n.2 (9th Cir. 1996).

## ANALYSIS

### I. Nordstrom Has Standing to Bring His Constitutional Claims

In *Nordstrom I*, we evaluated Nordstrom's Sixth Amendment claim and concluded that the allegation that ADC "interfered with attorney-client communications related to the appeal of [Nordstrom's] murder conviction and death sentence . . . [fell] squarely within the scope of the Sixth Amendment right to counsel."  762 F.3d at 909.  His standing did not arise from alleged prejudice that he suffered related to his conviction; rather it was an interest in enjoining a practice that chilled his Sixth Amendment rights.  *Id.* at 911.

On remand, ADC argued that Nordstrom lacked standing because his requested injunction would not affect his Sixth Amendment rights because he was in post-conviction proceedings under Arizona Rule of Criminal Procedure 32, and "[t]here is no constitutional right to an attorney in state post-conviction proceedings."  *Coleman v. Thompson*, 501 U.S. 722, 752 (1991).[1]  The district court held that

---

[1] This broad statement is not necessarily accurate for all state post-conviction proceedings.  Nordstrom argues that Sixth Amendment rights attach in his current state proceeding because he is raising an issue of prosecutorial misconduct that he was not allowed to raise until his post-conviction petition, making it an "initial-review collateral proceeding." *See Martinez v. Ryan*, 566 U.S. 1, 8–9 (2012); *State v. Nordstrom*, 280 P.3d 1244, 1250 (Ariz. 2012).  In *Martinez*, the Court left open the question of whether a prisoner has Sixth Amendment rights "in collateral proceedings which provide the first occasion to raise a claim of

Nordstrom had standing because "for standing analysis, the key point in time is the filing of the complaint," and "Nordstrom was still involved in criminal proceedings— implicating the Sixth Amendment—when he filed his original complaint." *Nordstrom II*, 128 F. Supp. 3d at 1213 n.6 (citing *Cornett v. Donovan*, 51 F.3d 894, 897 (9th Cir. 1995)).    The district court erred by failing to consider whether Nordstrom has standing *now*, and not merely at the time of the complaint, because "a live controversy must exist at all stages of the litigation, not simply at the time plaintiff filed the complaint." *Vasquez v. Los Angeles Cty.*, 487 F.3d 1246, 1253 (9th Cir. 2007).[2]

_____

ineffective assistance at trial," proceedings the Court termed "initial-review collateral proceedings."  566 U.S. at 8–9.  As discussed in this section, the law-of-the-case and law-of-the-circuit rules compel that we find that Nordstrom has standing to raise his Sixth Amendment claim. Thus, we decline to address the question of whether Sixth Amendment rights attach in Nordstrom's current proceedings under Arizona Rule of Criminal Procedure 32.

[2] *Cornett* (the case the district court cited) does not alter this basic rule.  In *Cornett*, four plaintiffs brought a declaratory judgment action, alleging that their constitutional rights were denied while they were institutionalized.  51 F.3d at 896.  The panel held that a plaintiff who was no longer institutionalized *at the time of the complaint* did not have standing because his injury would not be redressed by the declaratory judgment; however, the remaining three plaintiffs had standing because they were institutionalized *at the time of the complaint*.  *Id.* at 897. Although the panel focused on plaintiffs' status at the time of the complaint, it noted that two of the three plaintiffs were no longer institutionalized by the time of the appeal, but expressly declined to decide whether their release during appeal affected standing, because at least one of the plaintiffs remained institutionalized and the case could proceed with that plaintiff.  *Id.* at 897 n.2  *Cornett* thus makes clear that a plaintiff must have standing at the time the complaint is filed, but does not stand for the principle that standing at the time of appeal is irrelevant.

In *Nordstrom I*, we necessarily decided that Nordstrom had standing to bring his Sixth Amendment claim. 762 F.3d at 909, 911. At that time, Nordstrom's criminal appeals had concluded, and he was preparing his petition for post-conviction relief. *See State v. Nordstrom*, 280 P.3d 1244 (Ariz. 2012), *cert. denied*, 133 S. Ct. 985 (2013) (affirming Nordstrom's sentence). Because this case returns to our court in virtually the same procedural posture as *Nordstrom I*, the prior determination that Nordstrom had standing is both the law of the case and binding precedent that we must follow. *See Hilao v. Estate of Marcos*, 103 F.3d 767, 772 (9th Cir. 1996); *see also Milgard Tempering, Inc. v. Selas Corp. of Am.*, 902 F.2d 703, 715 (9th Cir. 1990) (noting that the law of the case doctrine applies to issues "decided explicitly or *by necessary implication* in [the] previous disposition") (emphasis added).

Although we have recognized exceptions to the law of the case doctrine, *see Gonzalez v. Arizona*, 677 F.3d 383, 389 n.4 (9th Cir. 2012) (en banc), *aff'd sub nom. Arizona v. Inter Tribal Council of Ariz., Inc*., 133 S. Ct. 2247 (2013), such exceptions "are not exceptions to the rule that, as a three-judge panel, we are bound by the law of the circuit in the absence of a recognized exception to that rule." *Barnes-Wallace v. City of San Diego*, 704 F.3d 1067, 1076–77 (9th Cir. 2012). No "recognized exception" to the law-of-the-circuit rule applies here. *See Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (holding that a panel may depart from the law of the circuit when "the relevant court of last resort . . . undercut the theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable"). Thus, pursuant to both the law-of-the-case doctrine and our law-of-the-circuit rules, Nordstrom has standing to assert his Sixth Amendment claim.

Nordstrom also has standing to assert his First Amendment claim, which was not addressed in *Nordstrom I*. To establish constitutional standing Nordstrom "must allege (1) a distinct and palpable injury-in-fact that is (2) fairly traceable to the challenged provision or interpretation and (3) would likely be redressed by a favorable decision." *Santa Monica Food Not Bombs v. City of Santa Monica*, 450 F.3d 1022, 1033 (9th Cir. 2006) (internal quotation marks and ellipsis omitted). Nordstrom has alleged that his First Amendment free speech rights were violated by ADC's legal mail policy and practices. Nordstrom has "a First Amendment right to send and receive mail" while incarcerated, *Witherow v. Paff*, 52 F.3d 264, 265 (9th Cir. 1995) (per curiam), and a decision invalidating ADC's legal mail policy would likely redress Nordstrom's alleged injury. Thus, Nordstrom has Article III standing to bring his constitutional claims.

## II. ADC's Outgoing Legal Mail Policy Violates the Sixth Amendment

Criminal defendants have a Sixth Amendment right to assistance of counsel, and the right applies in state court proceedings. *Gideon v. Wainwright*, 372 U.S. 335, 339–41 (1963). The right to counsel is violated when (1) "the government deliberately interferes with the confidential relationship between a criminal defendant and defense counsel," and (2) the interference "substantially prejudices the criminal defendant." *Nordstrom I*, 762 F.3d at 910. We have recognized a defendant's "ability to communicate candidly and confidentially" with defense counsel as "essential to his defense" and "nearly sacrosanct." *Id.* Thus, prison officials may not *read* an inmate's "outgoing attorney-client correspondence." *Id.* at 910–11. However, prison officials may "*inspect*[] an inmate's outgoing mail, in

his presence, to make sure that it does not contain, for example, a map of the prison yard, the time of guards' shift changes, escape plans, or contraband." *Id.* at 910.

ADC's policy requires that outgoing legal mail "be inspected for contraband, . . . and scanned to ensure that it is in fact legal mail," in the inmate's presence. However, the mail "shall not be read by staff" and must be sealed in the inmate's presence following inspection. The inspection must be "only to the extent necessary to determine if the mail contains contraband, or to verify that its contents qualify as legal mail and do not contain communications about illegal activities." ADC broadly defines contraband to include "[a]ny non-legal written correspondence or communication discovered as a result of scanning incoming or outgoing legal mail." Based on the testimony of a prison mail supervisor, it appears that ADC's practice of "scanning" involves reading some words in a letter and looking at each page, but not reading the text line-by-line.

ADC's policy goes beyond the inspection approved of in *Nordstrom I.* We explained that inspection of outgoing mail should be for "suspicious features" that can readily be identified without reading the words on a page; i.e., "maps of the prison yard, the times of guards' shift changes, and the like." *Nordstrom I*, 762 F.3d at 906. This level of inspection is akin to the "cursory visual inspection" that we approved of for outgoing mail sent to public officials in *Witherow*. 52 F.3d at 265–66.

We included "contraband" as a subject for inspection, *Nordstrom I*, 762 F.3d at 910, but ADC's broad definition of contraband transforms permissible inspection into page-by-page content review. Contraband is commonly understood to refer to smuggled or otherwise illegal goods. *See* Contraband, Black's Law Dictionary (10th ed. 2014). In her

testimony, ADC's Associate Deputy Warden defined contraband as "anything deemed [] to be a security threat or safety threat to [] staff or [] inmates." By invoking contraband in *Nordstrom I*, we intended to reference dangerous or illegal items hidden in legal mail that are not mail. ADC's inclusion of "[a]ny non-legal written correspondence or communication" in its definition of contraband extends *Nordstrom I* beyond its intended limits by requiring that staff inspect mail page-by-page to ensure that a letter concerns only legal subjects. This is plainly not the type of inspection envisioned in *Nordstrom I.*

We reiterate our holding that prison officials may *inspect*, but may not *read*, an inmate's outgoing legal mail in his presence. At most, a proper inspection entails looking at a letter to confirm that it does not include suspicious features such as maps, and making sure that illegal goods or items that pose a security threat are not hidden in the envelope. ADC's legal mail policy does not meet this standard because it requires that prison officials "verify that [the letter's] contents qualify as legal mail."

## III. ADC's Outgoing Legal Mail Policy Violates the First Amendment

Nordstrom has "a First Amendment right to send and receive mail," but prison regulations may curtail that right if the "regulations are reasonably related to legitimate penological interests." *Witherow*, 52 F.3d at 265 (internal quotation marks omitted); *see, e.g., Wolff v. McDonnell*, 418 U.S. 539, 577 (1974) (holding that prison officials may open, but not read, incoming legal mail in the presence of the inmate). Legitimate penological interests that justify regulation of outgoing legal mail include "the prevention of criminal activity and the maintenance of prison security." *O'Keefe v. Van Boening*, 82 F.3d 322, 326 (9th Cir. 1996).

When assessing the constitutionality of prison regulations that affect inmates' constitutional rights, we apply the four-factor test articulated in *Turner*, 482 U.S. at 89–91. We ask (1) whether there is "a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) "whether there are alternative means of exercising the right that remain open to prison inmates"; (3) what "impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; and (4) whether there is an "absence of ready alternatives." *Id.* (internal quotation marks omitted). Additionally, "[w]hen a prison regulation affects outgoing mail as opposed to incoming mail, there must be a closer fit between the regulation and the purpose it serves." *Witherow*, 52 F.3d at 265 (internal quotation marks omitted).

The district court dismissed Nordstrom's First Amendment claim. *Nordstrom II*, 128 F. Supp. 3d at 1219. In doing so, the court only considered the first *Turner* factor, and concluded that ADC's legitimate penological interest in institutional security justified its policy and practices. *Id.* The court reasoned that legal mail "can be used to introduce contraband into ADC's facilities, to facilitate criminal activity within the prison's walls, and to facilitate criminal activity on the outside." *Id.*

The district court is correct that outgoing legal mail *could* be used to facilitate criminal activity, but ADC did not present any evidence that this has ever happened, or that it is likely to happen. ADC did not produce any evidence that an Arizona inmate has ever abused the system when sending legal mail to an actual attorney. Evidence presented showed that inmates have attempted to abuse the legal mail system by sending mail disguised as legal mail to non-lawyers, and

that non-lawyer gang members have attempted to send mail disguised as legal mail to incarcerated gang members. Additionally, ADC provided evidence that three attorneys in Arizona have criminally assisted inmates by smuggling contraband *into* a prison and by facilitating communication among gang members. None of these instances involving actual attorneys involved abuse of outgoing legal mail. Thus, ADC presented no evidence that outgoing legal mail addressed to a licensed attorney has ever posed the security threats identified by the district court.

The district court erred by not distinguishing between the risks of incoming and outgoing mail in its analysis. Although ADC need not "satisfy a least restrictive means test," its restrictions on outgoing mail must have "a closer fit between the regulation and the purpose it serves" than incoming mail restrictions. *Witherow*, 52 F.3d at 265 (internal quotation marks omitted). This is because "outgoing personal correspondence from prisoners [does] not, by its very nature, pose a serious threat to prison order and security." *Thornburgh v. Abbott*, 490 U.S. 401, 411 (1989).

Although prison security is undoubtedly a legitimate government interest, ADC has not met its burden to justify its intrusion into *outgoing* legal mail. With no evidence that such mail has ever posed a threat, a policy requiring a page-by-page inspection to determine if the contents actually concern legal matters is unduly intrusive.

The district court failed to consider the remaining *Turner* factors, which largely support Nordstrom's claim. There is "an obvious, easy alternative[]" to ADC's policy. *See Turner*, 482 U.S. at 90. ADC could use procedures to ensure that outgoing legal mail is sent to a licensed attorney, rather than inspecting the contents to make sure that the letter

concerns legal subject matter.  Because there is no evidence that legitimate outgoing legal mail has posed a security threat, readily available alternative means suggest that ADC's policy "is an 'exaggerated response' to prison concerns." *See id.*

Because there is no evidence of abuse of the legal mail system when outgoing mail is addressed to an attorney, there is no reason to conclude that a more limited inspection of outgoing legal mail would have an adverse effect on prison staff, other inmates, or allocation of resources within prisons. *See id.*  Checking a state bar's list of licensed attorneys is no more onerous than page-by-page inspection to confirm legal content.  Indeed, an ADC prison mail supervisor testified that he uses the Arizona Bar Association's website "every single day," and that finding out whether a given individual is an attorney can be done "very easily."

We also consider "whether there are alternative means of exercising the right that remain open to prison inmates." *Id.* Under this factor "'the right' in question must be viewed sensibly and expansively." *Thornburgh*, 490 U.S. at 417. That is, we consider whether inmates have sufficient forms of free expression, not whether the exact expression at issue is available through alternative means. *Id.* at 417–18.  This factor does not weigh heavily for or against ADC's policy. Inmates are able to communicate with attorneys through phone calls and in-person meetings, giving them an outlet for expression.  However, confidential legal correspondence, free from unreasonable censorship and the chilling effect of excessive monitoring, remains an important avenue of communication for inmates, and alternative means do not entirely make up for infringement on this right.

On balance, the *Turner* factors point to the conclusion that ADC's outgoing legal mail policy unreasonably intrudes on Nordstrom's First Amendment rights. Due to the more limited threat that outgoing mail poses to prison security, and ADC's inability to proffer evidence to show that such mail poses a threat, the ends do not justify the means. Moreover, there are readily available, less restrictive alternatives that are unlikely to have an adverse effect on prisons.

## IV. Nordstrom Is Entitled to Injunctive Relief

As we determined in *Nordstrom I*, Nordstrom's allegations support a claim for injunctive relief. 762 F.3d at 911–12. Nordstrom has demonstrated that he is realistically threatened by repetition of ADC's violation, because his injury stems from ADC's policy, and he remains incarcerated in Arizona state prison. *See id.*

## CONCLUSION

We REVERSE the district court's dismissal of Nordstrom's Sixth and First Amendment claims. We hold that ADC's outgoing legal mail policy does not satisfy the *Nordstrom I* standard for an outgoing legal mail inspection policy, or the *Turner* factors. We REMAND for the district court to craft a decree based on the evidence of actual risks in Arizona state prisons.